[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: APPLICATION FOR PREJUDGMENT REMEDY
In this matter, the plaintiff, as a member of a class consisting of former clients of the defendant professional corporation (Corporation), seeks, on behalf of herself and the members of such class, a prejudgment remedy by way of garnishment and attachment against the Corporation and the individuals Norman Ebenstein (Norman) and Douglas Ebenstein (Douglas).
The complaint alleges that the Corporation at all times stated in the complaint was a professional corporation for the practice of law; and that the defendants Norman and Douglas were both attorneys at law practicing law in the State of Connecticut, and were stockholders, directors and officers of the Corporation.
The complaint further alleges that on or about November 30, 1988, the plaintiff authorized the defendants to settle a third party liability claim; that the plaintiff understood the attorney's fee would be one-third of the gross recovery, pursuant to a certain retainer agreement; that the case was settled for $20,000, of which the defendants took a legal fee of $6,666.66; and that when repaying the basic reparations benefits (BRB) to her insurance carrier, the defendants deducted a fee equal to one-third of the basic reparations.
It is further alleged that such action violates 52-251c of the General Statutes by exacting a fee for services rendered in excess of that provided for in Section 52-251c of the General Statutes.
The class consisted of such former clients of the Corporation and Norman and Douglas whose cases were settled or judgment obtained after October 1, 1986 and who were charged an attorney's fee in excess of that provided for in Section 52-251c
of the General Statutes.
The First Count is based on CUTPA and alleges that the actions of the defendants constituted a violation of Sec.42-110b of the General Statutes. CT Page 3608
The Second Count alleges a breach of contract, arising out of a claim that the defendants took more funds than allowed by the retainer agreement between the parties.
The Third Count alleges a breach of fiduciary duty, arising out of the attorney-client relationship and not informing the client of the additional fee.
The Fourth Count alleges a violation of Section 52-564 of the General Statutes. (Theft.)
The Fifth Count alleges common law misrepresentation in that the defendants made or caused to be made or participated in or permitted the making of material false and misleading statements in regard to attorney's fees to be charged.
The Sixth Count alleges professional negligence in that the aforesaid conduct, to wit, charging fees in excess of those allowed by law, fell below the acceptable professional standard of a reasonably competent personal injury attorney.
The plaintiff seeks, by way of relief, money damages, repayment of excessive fees, punitive damages, a constructive trust, an accounting, treble damages and other equitable relief.
Attached to the complaint as exhibits are (1) a contingent fee agreement between the Corporation and the plaintiff, whereby the parties agreed to a legal fee of one-third of all amounts recovered by suit, settlement or otherwise, subject to any applicable law at the time of recovery; (2) a statement of account, showing a settlement of $20,000, a legal fee of $6,666.66, disbursements and a deduction for an Allstate Insurance No-fault Lien in the amount of $4,540.00 and (3) a check with cover letter from the Corporation to Allstate showing total lien (sic) in the amount of $4,540.00; the check amount being $3,026.67 and an attorneys fee of $1,513.33.
The prejudgment remedy sought was an attachment on the property of the defendants at 5 Squirrel Hill Rd., West Hartford, Conn. and 37 Longview Dr., West Hartford, Conn. and to garnish several law firms for fees due the defendants. The amount sought was $3 million.
The plaintiff also filed offers of proof that 26 former clients of the Corporation would testify that the defendants withheld a legal fee from each of them equal to one-third of the amount of basic reparations benefits (BRP) paid by such clients insurance carrier. CT Page 3609
As to damages, the plaintiff offered to prove that the average additional fee taken in such files was $1,230 and that the defendants disposed of 1,244 cases between July 1, 1989 and June 30, 1990. The claimed damages on this basis would amount to $1,530,120. The plaintiff further claims punitive damages, treble damages and attorneys fees under CUTPA. Total damages are estimated at $4,500,000.
On August 14, 1991, the parties stipulated that the defendants would deliver to the plaintiff copies of all statements of account for settlement of clients whose causes of actions arose on or after October 1, 1986.
On October 30, 1991, the parties stipulated to certification of a class comprised of all former clients of the defendants whose causes of actions occurred on or after October 1, 1986 and who were charged by the defendant with a fee of one-third of the amount of basic reparations benefits paid by such clients' insurers.
On November 25, 1991, the plaintiff moved to amend her complaint to include those former clients of the defendants whose claims were settled or judgment entered on or after March 14, 1978, and who were charged a fee in excess of one-third of the recovery. No timely objection was filed.
On November 25, 1991, Mary Rose Flaherty, an attorney with the firm representing the plaintiff, filed an affidavit that she had examined the statements of account of settlements for former clients of the defendant whose causes of action occurred subsequent to October 1, 1986. The number of such clients who were charged a legal fee against basic reparations payments was 699, and the amount withheld as fees was $681,751.02. The affidavit further states that she examined similar statements for clients whose causes of action occurred prior to October 1, 1986, of these, there were 683 statements with a fee withheld. The total amount of which was found to be $655,371.93.
On November 25, 1991, William J. Sweeney, Jr., an attorney with the firm representing the plaintiff, filed an affidavit that he and Attorney Flaherty had accrued legal fees for a total of $46,370 and stating he would be seeking a multiplier of three for fees incurred at trial.
On November 26, 1991, the plaintiff filed an amended application for a prejudgment remedy seeking a prejudgment remedy to secure the sum of $3,000,000.
I CT Page 3610
The subject matter is involved with the power of this court to issue a prejudgment remedy, pursuant to General Statutes52-278d(a), which reads as follows:
 "The defendant shall have the right to appear and be heard at the hearing. The hearing shall be limited to a determination of whether or not there is probable cause to sustain the validity of the plaintiff's claim. If the court, upon consideration of the facts before it, finds that the plaintiff has shown probable cause to sustain the validity of his claim, then the prejudgment remedy applied for shall be granted as requested or as modified by the court unless the prejudgment remedy or application for such prejudgment remedy was dismissed or withdrawn pursuant to the provisions of section 52-278j."
 "In determining whether to grant an application for a prejudgment remedy, pursuant to General Statutes 52-278d, `the trial court's function is to determine whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits. . . . "The hearing in probable cause for the issuance of a prejudgment remedy is not contemplated to be a full scale trial on the merits of the plaintiff's claim. The plaintiff does not have to establish that he will prevail, only that there is probable cause to sustain the validity of the claim. . . . The court's role in such a hearing is to determine probable success by weighing probabilities." . . . Moreover, this weighing process applies to both legal and factual issues.' (Citation omitted.) Bank of Boston Connecticut v. Schlesinger, 220 Conn. 152, 156, 595 A.2d 872 (1991)."
Hoke Incorporated v. Circuits, Inc., 26 Conn. App. 802.
Our Supreme Court recently addressed the court's role in determining probable cause, in a similar fact-finding proceeding, in the case of In Re Keijam T., 221 Conn. 109, 125:
 "Thus the trial court's role in determining probable cause in an evidentiary hearing pursuant to 46b-127
is similar to its role in other factfinding proceedings: it must consider all the evidence before it, including any frailties therein disclosed by cross-examination; it must draw whatever inferences therefrom that it considers to be reasonable and logical; and it must decide whether that evidence, including those inferences, would warrant a person of reasonable caution to believe CT Page 3611 that the respondent committed the crime with which he is charged. The only difference between this proceeding and other factfinding proceedings is that the level of certainty required in this proceeding is considerably lower than in other proceedings. Proof of probable cause is not as demanding as proof by a fair preponderance of the evidence; Ledgebrook Condominium Assn., Inc. v. Lusk Corporation, 172 Conn. 577, 584, 376 A.2d 60 (1977); Newtown Associates v. Northeast Structures, Inc., 15 Conn. App. 633, 636, 546 A.2d 310 (1988); and is substantially less demanding than proof beyond a reasonable doubt. State v. Patterson, [213 Conn.] 720. Although `[t]he quantum of evidence necessary to establish probable cause exceeds mere suspicion . . . [t]here is often a fine line between mere suspicion and probable cause, and [t]hat line necessarily must be drawn by an act of judgment formed in light of the particular situation and with account taken of all the circumstances.' (Internal quotation marks omitted.) Id."
On December 19, 1991, the defendants filed a memorandum in opposition to the application for a prejudgment remedy in accordance with the amended application.
In such memorandum, the defendants (sic) cite the following cases in challenging the granting of a prejudgment remedy under Connecticut law.
 (1) Connecticut v. Doehr, 59 U.S. LW 587, 4591. (2) Pinsky v. Duncan, 898 F.2d 852. (3) Republic National Bank of N.Y. v. Hill, et al. (DN 119071, Conn. Superior Court at Stamford)
The defendants argue that the statute is unconstitutional (Defendants Brief p. 2). The holding in Doehr is that the statute (Sec. 52-278e(a)(1)) violates the requirements of due process by authorizing an attachment prior to judgment without notice or hearing. However, in this instance, the court has held a hearing. Accordingly, the Doehr case is inapposite.
The defendants then cite Judge Dean's decision in Republic National Bank, supra (Defendants' brief p. 4). There Judge Dean noted, "In conclusion, because there is no clear meaning for probable cause in General Statutes Section 52-278c(a)(2), defendants are denied their opportunity to be heard in a meaningful manner . . ." 5 C.L.R. No. 9, 211. Suffice it to say the more recent statement by the Connecticut Supreme Court is in disagreement. CT Page 3612
The defendants further cite Pinsky v. Duncan, 898 F.2d 852, at page 858. Therein the Court of Appeals held the requirements of the statute (Sec. 52-278e) to violate the due process clause; because it permits ex parte attachments in the absence of extraordinary circumstances — i.e., in the absence of a hearing. This, of course, is not pertinent to the present issue.
 II
As noted, supra, the plaintiff has presented six theories of recovery of the funds allegedly wrongfully withheld. The ultimate issues as found therein are: (1) did the defendants wrongfully withhold from the plaintiff a portion of the reimbursement of BRB and (2) did the total legal fee taken exceed that fixed by statute — to wit: Sec. 52-251c.
 A.
No-fault insurance
In 1972, the General Assembly enacted the no-fault motor vehicle insurance act (PA 72-273). Gentile v. Atermatt,169 Conn. 257.
"Under the act an insurer is liable to pay, without fault, basic reparations benefits up to $5,000 for economic loss arising out of the ownership, maintenance or use of private passenger motor vehicles." Hartford Accident Indemnity Co. vs. Holder, 37 C. Supp. 723, Sec. 38a-365 Conn. Gen. Stats. (formerly Sec. 38-320). Additional benefits are available by contract, Sec. 38a-374 Conn. Gen. Stats. (formerly Sec. 38-330). See also Conn. State Regs. 38-175a-6-d-3. The original act provided that an insurer who has paid basic reparations benefits is entitled to reimbursement if damages are recovered in a suit against the tortfeasor. Gentile, supra, p. 274. (Formerly Sec. 38-325 Conn. Gen. Stats. now Sec. 38a-369 Conn. Gen. Stats.)
The last section of the act was amended by Public Acts 1980 No. 131, which added a provision that required an amount which represents the insurer's contribution toward attorney's fees for the collection of basic reparations benefits to be deducted from the reimbursement. Koskoff, Koskoff and Bieder v. Allstate Ins. Co., 187 Conn. 451, 456. In Koskoff, the plaintiff, a law firm sought a ruling as to whether it was entitled to an attorney's fee from the reimbursement of basic reparations benefits to the client's insurer. The claims were settled prior to the 1980 amendment. The Supreme Court ruled against the plaintiff, who had claimed compensation in (1) quantum meruit; (2) unjust enrichment; (3) the trust fund doctrine, p. 457. CT Page 3613
On the first ground, the court noted that, by sending of the notice of lien to the plaintiff, the insurer was not contracting for legal services. On the second ground, it noted that unjust enrichment is inapplicable in the context of a statutory lien. On the third ground, it noted that the elements of a trust, express or implied, were not in the case. See Simmons v. U.S. Fidelity Guaranty Co., 35 C. Supp). 664, 667.
The statute in effect during the times pertinent to this case reads as follows, in pertinent part:
 "Sec. 38a-369. (Formerly Sec. 38-325). Subrobation. (a) Except as provided in this section, an insurer does not have, and may not directly or indirectly contract for, any right of subrobation to the proceeds of any cause of action of a recipient of basic reparations benefits against any person or organization not entitled to an exemption from liability under section 38a-368.
 (b) Whenever a person who receives basic reparations benefits for an injury recovers damages, either by judgment or settlement, from the owner, registrant, operator or occupant of a private passenger motor vehicle with respect to which security has been provided under section 38a-19 and 38a-363 to 38a-388, or from a person or organization legally responsible for his acts or omissions, the insurer is entitled to reimbursement from the claimant to the extent that said basic reparations benefits have been paid, minus an amount which represents the insurer's contribution toward attorney's fees for the collection of basic reparations benefits. Such amount shall be computed by multiplying the total amount of such reasonable attorney's fees and costs, by a fraction, the numerator of which shall be the amount of basic reparations benefits received by the claimant and the denominator shall be the amount of damages recovered by the claimant, less court costs. In no event shall such amount exceed one-third the amount of the basic reparations benefits to be reimbursed to the insurer. The insurer shall have a lien on the claimant's recovery for the amount to which he is entitled for such reimbursement; provided no such lien shall attach until such time as the proceeds of such recovery are in the possession and control of such claimant."
 B
Limitation on contingency fees CT Page 3614
Section 52-251c of the General Statutes is applicable to causes of action occurring after October 1, 1987, and reads as follows:
 Sec. 52-251c. Limitation on attorney contingency fees in personal injury, wrongful death and property damage actions.
 (a) In any claim or civil action to recover damages resulting from personal injury, wrongful death or damage to property occurring on or after October 1, 1987, the attorney and the claimant may provide by contract, which contract shall comply with all applicable provisions of the rules of professional conduct governing attorneys adopted by the judges of the superior court, that the fee for attorney shall be paid contingent upon, and as a percentage of: (1) damages awarded and received by the claimant; or (2) settlement amount pursuant to a settlement agreement.
 (b) In any such contingency fee arrangement such fee shall be the exclusive method for payment of the attorney by the claimant and shall not exceed an amount equal to a percentage of the damages awarded and received by the claimant or of the settlement amount received by the claimant as follows: (1) Thirty-three and one-third per cent of the first three hundred thousand dollars; (2) twenty-five per cent of the next three hundred thousand dollars; (3) twenty per cent of the next three hundred thousand dollars; (4) fifteen per cent of the next three hundred thousand dollars; and (5) ten per cent of any amount which exceeds one million two hundred thousand dollars.
 (c) For the purposes of this section, "damages awarded and received" means in a civil action in which final judgment is entered, that amount of the judgment or amended judgment entered by the court that is received by the claimant; "settlement amount received" means in a claim or civil action in which no final judgment is entered, the amount received by the claimant pursuant to a settlement agreement; and "fee" shall not include disbursements or costs incurred in connection with the prosecution or settlement of the claim or civil action, other than ordinary office overhead and expense.
The consideration of the provisions of this statute is not appropriate in the present case, since the plaintiff's cause of action arose on April 1, 1987. See Biro v. Hill, 214 C 1, 6, 7 CT Page 3615 n 1.
 III
Hearing
The court held a hearing on the plaintiff's application on December 19 and 20, 1991.
The plaintiff filed as Exhibit A requests for admission that had not been timely objected to. Therein, the plaintiff asked the defendant Ebenstein and Ebenstein, P.C. to admit the truth of certain statements related to her, e.g., that it had represented the plaintiff in a third party action arising as a result of an accident that occurred on April 1, 1987 — together with other statements relating to such representations. Such requests also sought the admission as to the genuineness of certain documents, e.g. a contingent fee agreement and statement of account, (SOFA), presumably identical to documents attached to the original complaint.
Similar requests for admission were filed for twenty other members of the class. The requests generally address the issues of representation, fee arrangement, settlement and payment of the amount liened for basic reparations benefits (BRB). The documents whose genuineness was requested to be admitted also included checks issued by the corporation to BRB insurers and cover letters in connection herewith. Such documents were offered to establish the pattern of uniformity that (a) at settlement, the entire amount of BRB was deducted from the client's net proceeds and labelled "No-fault lien"; and (b) of said sum, two-thirds of the amount was forwarded to the BRB payor; with the defendant Corporation retaining the balance as a legal fee.
The court was asked to take judicial notice of two affidavits in the court file, given by associates with the firm representing the plaintiff. (#132 and 133).
In #132, the deponent, Mary Rose Flaherty, avers that she had reviewed the statements of account from 1987 to the date thereof (November 21, 1991) and had photocopied 699 statements, and that in each such statement, there was a deduction for no-fault lien reimbursement; that in a majority of such statements, there were hand written notes indicating a payment of 2/3 of such amount to the carrier and 1/3 retained by the defendant Corporation, and that she has calculated the total of such retentions to be $681,751.02.
In #133, the deponent, William J. Sweeney, avers that the CT Page 3616 plaintiff's law firm had accrued legal fees due to the dates thereof (November 21, 1991) in the amount of $46,370.00 and that additional fees in the order of $140,000 would accrue to the time of completion of suit.
The court heard further testimony from Attorney Robert Fiedler, a former associate with the defendant Corporation and Oscar Birman, a former bookkeeper for the defendant Corporation, from July 1, 1987 to October 1991.
Mr. Birman testified that Norman Ebenstein and Douglas Ebenstein were the only officers of the defendant Corporation, and that both presently reside in Florida; that he reconciled the Corporation's bank statements and was familiar with the signatures of both attorneys. He identified the signature of a copy of a check (Exh. A-3 to plaintiff's Exh. A) as being that of Douglas, and the cover letter as being on the letterhead of the defendant Corporation which limited its practice to personal injury. He identified the signatures on other documents in Exh. A, including checks and transmittal letters to insurers as being those of Norman and Douglas Ebenstein.
He also testified that Norman and Douglas Ebenstein had overall responsibility for management of the operations of the defendant Corporation; that they were on the premises daily as active managers of the practice and that there were always signatories on the clients' funds account and checked all disbursements from such account.
Attorney Fiedler testified that he was in private practice but still had a professional relationship with the individual defendants, both of whom reside in Florida; that the defendant Corporation had in effect two partners, i.e., the individual defendants, who set policy for the practice. He also identified the signatures of several documents in Exh. A as that of Douglas Ebenstein.
The defendants offered no evidence, nor did the individual defendants appear in court.
 IV
The foregoing evidence will support a bona fide belief in the existence of the following facts: at all times pertinent hereto:
1. Norman Ebenstein and Douglas Ebenstein were attorneys at law in the State of Connecticut.
2. Ebenstein and Ebenstein, P.C. was a professional CT Page 3617 Corporation whose sole officers were Norman Ebenstein and Douglas Ebenstein.
3. The law practice conducted by Ebenstein and Ebenstein, P.C., was limited to personal injury matters.
4. Norman Ebenstein and Douglas Ebenstein supervised personally the disbursements of the proceeds of the financial recovery of their clients, and signed the checks from the clients' funds account therefor.
5. The operative document in settlement of their clients' cases was a statement of account (SOFA), showing gross proceeds, attorney's fee, disbursements for costs and expenses, unpaid bills, (if any), and an item entitled "No-fault lien", and identifying an insurance carrier. Either Norman Ebenstein or Ebenstin supervised the execution of the SOFA by the client. The items entitled "no-fault lien" was actually the full amount of the basic reparations benefits paid by the insurer of the client to such client.
7. Of the funds identified as "no-fault lien", two-thirds of such sum was disbursed by the defendants to the "no-fault" carrier, and the defendant corporation retained one-third of such sum as a "legal fee."
8. When the defendant Corporation was retained, the client would execute a "Contingent Fee Agreement" which, the claimant agreed to pay the law firm one-third of all sums recovered by suit, settlement, or otherwise, subject to any applicable law at the time of recovery (but in no event more than the percentage above stated).
9. The defendants, Douglas and Norman, as skilled personal injury lawyers, were familiar with the provisions of law relating to personal injury matters.
10. The practice of deducting a "legal fee" from the reimbursement of BRB was not disclosed to the client.
 V
In the context of an application for a prejudgment remedy, it has been noted:
 "The plaintiff does not have to establish that he will prevail, only that there is probable cause to sustain the validity of the claim. 1 Stephenson, Conn. Civ. Proc. (2d Ed., 1975 Sup. ) 55C (c).
CT Page 3618
 Proof of probable cause as a condition of obtaining a prejudgment remedy is not as demanding as proof by a fair preponderance of the evidence. "The legal idea of probable cause is a bona fide belief in the existence of facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. Wall v. Toomey, 52 Conn. 52 Conn. 35, 36; see 6 Am.Jur.2d, Attachment and Garnishment, 599."
Ledgebrook Condominium Assn. v. Lusk Corporation, 172 Conn. 577,584.
The gravamen of the instant action is that this plaintiff, and other members of the class, are entitled to recover the funds allegedly illegally withheld by the defendants from the plaintiff and members of the class.
The procedure to be followed in providing for reimbursement of BRB from the proceeds of a judgment or settlement against a third party is set forth in Section 38a-369 Conn. Gen. Stats. Such statute was in effect in the present form since October 1, 1981 and would apply in this case.[1] Said statute provides, in effect, that in such case, "the insurer is entitled to reimbursement from the claimant to the extent that basic reparations have been paid, minus an amount which represents the insurer's contribution toward attorney's fees for the collection of basic reparations benefits." The maximum amount of such contribution is one-third of the BRB to be reimbursed. The insurer shall have a lien on the claimant's recovery for the amount to which he is entitled for reimbursement, which shall attach when the proceeds are in the possession and control of the claimant.
In Koskoff, supra, p. 457, the Supreme Court rejected the claim by the claimant's attorneys that it was due a legal fee from the insurer, on the basis that advising the claimant's attorney of its claim was not contracting for the services of the claimant's attorney.
The corollary question is whether the claimant must pay an additional fee to his attorney for collecting and processing the no-fault reimbursement. The court thinks not.
In the present case, the plaintiff and defendant Corporation agreed that the plaintiff would pay to the defendant Corporation one-third of the amount recovered. The fee she incurred was $6,666.66. The statute clearly provides that she CT Page 3619 is entitled to a contribution to such fee from the no-fault carrier. Simply put, the statute requires such sum, i.e., one-third of the reimbursement be paid to the plaintiff. The defendant Corporation, nor any employee or officer thereof, is performing no additional service, than if it were paying any other obligation — liened or otherwise — from the proceeds, i.e., unpaid bills or liens for worker's compensation, welfare or medical services corporations.[2] The responsibility to discharge the lien by payment to the plaintiff's insurer rests with the plaintiff's attorney, in this case the defendants, as well as the claimant (plaintiff) herself. Shelby Mutual Insurance Co. v. Della Ghelfa, 200 Conn. 630, 641.
As noted, supra, in Hoke Incorporated, this court is obligated to weigh both legal and factual issues.
Having completed such weighing process, the court finds as follows as to whether plaintiff, and the members of the class would be probably successful under the causes of action alleged in the complaint.
 VI
The court finds that there exists probable cause that the plaintiff would be successful under the First, Second, Third, Fourth and Fifth, but not the Sixth Count.
The First Count is a claim under CUTPA (Sec. 42-110a et seq. Conn. Gen. Stats.)
Sec. 42-110g permits an action to any person who has suffered any ascertainable loss of money or property as the result of the use or employment of any practice proscribed by Sec. 42-110b. There is sufficient evidence to support this requirement.
 "General statutes 42-110b(a) provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." The act further provides for a private cause of action for actual and punitive damages. General Statutes 42-110g.
 In determining whether a case falls within the scope of CUTPA's general description of unfair or deceptive practices, our courts have adopted the "cigarette rule" set forth in FTC v. Sperry Hutchinson Co., 405 U.S. 233, 92 A.Ct. 898, 31 L.Ed.2d 170 (1972). McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558, 567-68, 473 A.2d 1185 (1984); Siudyla v. ChemExec CT Page 3620 Relocation Systems, Inc., 23 Conn. App. 180, 186-87, A.2d (1990). Under that standard, three factors will be looked at to determine if an action or practice is unfair: "`"`(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some commonlaw statute, or other established concept of fairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers . . . .'" (citation omitted) Dow Condon, Inc. v. Anderson, 203 Conn. 475, 483, 525 A.2d 935 (1987).
 It is clear that the provision of at least some legal services constitutes "the conduct of any trade or commerce," and that CUTPA applies to the conduct of attorneys. Heslin v. Connecticut Law Clinic of Trantolo Trantolo, 190 Conn. 510, 520-21, 461 A.2d 938 (1983). Thus, the question of whether that service is provided unfairly requires the application of the "cigarette rule" enumerated above."
Noble v. Marshall, 23 Conn. App. 227, 229-230.
The facts previously found provide support for the three prongs, i.e., (1) the practice offends the policy laid down by statute; (2) it is unethical, in that there was no disclosure to the client and (3) there is substantial injury to consumers of legal services.
The Second Count claims a breach of contract, i.e., the retainer agreement, in that the defendants received a greater monetary consideration than that agreed upon. See 7 Am Jur. 2nd, Attorneys at Law, 212, to the effect that a client may sue to recover funds improperly retained by the attorney.
The Third Count alleges a breach of a fiduciary duty. See Alaimo v. Royer, 188 Conn. 36, 41. There is sufficient evidence to support a finding that the trier of fact would find that an attorney-client relationship existed between the defendants and the plaintiff. Dunham v. Dunham, 204 Conn. 303, 320. As noted in Alaimo, at p. 41, "Where such a relationship is found to exist, the burden of fair dealing shifts to the fiduciary." See, also, Solomon v. Aberman, 196 Conn. 350-384; Nolan v. Foreman, 665 F.2d 738, 743.
The Fourth Count alleges a statutory claim for treble damages for Theft. In Lauder v. Peck, 11 Conn. App. 161, the CT Page 3621 court found that the defendant, an attorney at law, was sued by a former client, who alleged and proved that the defendant falsely made and forged a release of lis pendens which the plaintiff had filed against real estate of her former husband. The defendant, by signing the release, obtained money from the sale of such real estate. The court noted that clear and convincing proof is required to assess treble damages, p. 163. The court further noted that prejudgment interest on money wrongfully withheld from the owner is a proper element of damages, pp 167, 168; and allowed the penalty to include such interest.
In the Fifth Count, the plaintiff claims common law misrepresentation, by the making of material false and misleading statements to the plaintiff regarding attorney's fees.
"The essential elements of an action in fraud are that a false representation was made as a statement of fact; that it was untrue and was known to be untrue by the party making it; that it was made to induce the other party to act on it; and that he did so act to his injury." Paiva v. Vanech Heights Construction Co., 159 Conn. 512, 515. In this case, the claim is that the overstatement of the no-fault lien was such a false representation, and was known to be false by the defendants, and that the plaintiff was induced to act, i.e., consent thereto by signing the SOFA, to her injury. Again, the burden of proof is by clear and convincing evidence. Lewis v. Lewis, 162 Conn. 476,481.
The Sixth Count appears to claim legal malpractice, essentially in failing to supervise properly the firm's employees by charging fees in excess of those provided by the retainer agreement.
Failure of a supervisory lawyer or partner to ensure conformance to the Rules of Professional Conduct by a lawyer under such supervision is a matter for discipline under Rule 5.1.
A claim of malpractice based upon a violation of the Rules has been rejected by our Supreme Court. Mozzochi v. Beck,204 Conn. 490, 501.
The plaintiff cites no authority to the contrary.
The aforesaid findings of probable cause that the plaintiff will prevail extend to both the corporation and the individual partners. In a "memorandum" dated December 17, 1991, Attorney Seligman, counsel for all of the defendants, argues, (p. 8) that CT Page 3622 no prejudgment remedy should issue against either Norman Ebenstein nor Douglas Ebenstein, because the amended complaint (Par. #6) merely alleges such persons to be officers, directors and/or stockholders of the Professional Corporation. Said paragraph further alleges that each was an attorney at law licensed to practice in Connecticut.
It is not disputed that the defendant Corporation was organized under Chapter 594a of the General Statutes "Professional Service Corporations." Such statutes provide that the professional services rendered on behalf of the Corporation shall be performed by officers, employees and agents licensed to otherwise legally authorized to render such services in Connecticut, i.e., in this case, attorneys at law, Sec. 33-182d.
Sec. 33-182e states that the law applicable to the professional relationship between lawyer and client in effect on May 29, 1969 shall not be abridged, provided that any officer, agent or employee shall be personally liable and accountable for negligent and wrongful acts committed by him, or by an person under his direct supervision and control, while rendering personal services.
There was ample evidence to the effect that the individual defendants were the only two officers, that they directly supervised and controlled the entire practice, and that the execution of the SOFA's was performed either before one of the individual defendants or under his direct supervision. Hence, as officers, the individual defendants were each liable, with the Corporation, for the debts stated, supra.
While the foregoing language in the Connecticut statute should make such individual liability clear, there has been little judicial interpretation thereof. In Altieri v. Nanavati, 41 Conn. Sup. 317, the plaintiff sued a veterinarian for negligence in two counts, one against the named defendant individually, and the second against a professional corporation in which the defendant was the sole stockholder and apparently the sole veterinarian. The defendant moved for summary judgment on the ground, inter alia, that there could be no claim against him individually, since he was practicing as a professional corporation. The court denied the defendants motion on the basis there was a question of fact as to whether he was an employee of the professional corporation when he engaged in the conduct the plaintiff complained of. The court cited Scribner v. O'Brien, Inc., 169 Conn. 389, 404 for the proposition that an agent or officer of a corporation is liable to third persons injured by his conduct in committing or participating in a tort, whether or not he acts on behalf of the corporation. CT Page 3623
The individual responsibility of a lawyer in a professional corporation has been the subject of annotation in 4 A.L.R.3rd 383. Therein, the following language from Re Florida Bar, 133 So.2d 554
is cited.
 "Chapter 61-64, supra, is similar to statutes recently enacted by the Legislatures of a number of other states. Connecticut, Public Act No. 158; Georgia, Act No. 285 of 1961; Illinois, Senate Bill No. 804 of 1961; Ohio, Senate Bill No. 550 of 1961; Oklahoma, Senate Bill No. 399 of 1961; Pennsylvania, Act 416 Senate Bill 525), 1961; Texas, Chapter 158 (Vernon's Ann Civ St, Art 6132b); Wisconsin, Chapter 350, Laws of 1961. The basic purpose of these enactments is to enable those engaged in various professions to form corporations or associations for the practice of their professions. The statutes apply particularly to numerous professional and other self-employed groups which previously were not permitted to incorporate. Traditionally, the so-called learned professions have not been permitted to practice as corporate entities. 13 Am Jur, Corporations, Section 837, page 838; 5 Am Jur, Attorneys at Law, Section 25, page 276. The principal reason for this change in attitude regarding these professional groups appears to arise out of the provision of the Internal Revenue Code of 1954, USCA Title 26, 1 et seq., which permit an employer to establish a pension fund for the benefit of his employees. Payments by the employer into the fund are income tax deductible. Payments to the employee do not subject him to income tax until he actually receives the pension later in life. . . . The non-corporate status of the lawyer was deemed necessary in order to preserve to the client the benefits of a highly confidential relationship, based upon personal confidence, ability, and integrity. If a means can be devised which preserves to the client and the public generally, all of the traditional obligations and responsibilities of the lawyer and at the same time enable the legal profession to obtain a benefit not otherwise available to it, we can find no object to the proposal.
 As we read Chapter 61-64, supra, implemented by the Rules which we hereafter announce, the highly personal obligation of the lawyer to his client is in no way adversely affected. The individual practitioner, whether a stockholder in a corporation or otherwise, will continue to be expected to abide by all of the Rules and Canons of professional ethics heretofore or hereafter required of him. The corporate entity as a method of doing business CT Page 3624 will not be permitted to protect the unfaithful or the unethical. As a matter of fact, the corporate entity itself will automatically come within the ambit of our jurisdiction in regard to discipline. In addition to the individual liability and responsibility of the stockholder, the corporate entity will be liable for the misprisions of its members to the extent of the corporate assets. . . .
 In approving the rules which we hereafter announce the members of The Florida Bar are again forewarned that such approval is not to be construed as an intention to eliminate any of their obligations as individuals to meet the requirements of the Integration Rule and the Rules and Canons of Ethics. On the contrary, because of the privilege that is being made available to the lawyers of this State there will be increased responsibilities commensurate with the privilege."
Further, in the instant case, there was evidence that the professional corporation operated as a partnership, with two partners, the individual defendants.
In Zimmerman v. Hogg Allen, Professional Assn.,286 N.C. 24, 209 S.E.2d 795, cited in 76 A.L.R.3d 1004, the court discussed the exercise of the powers of the officers in a professional corporation, at p. 801.
 "By its very nature, a professional association more nearly resembles the closely held corporation than a public corporation. Particularly within the context of a law practice, it is highly unlikely that busy attorneys will resort to all of the formalities of the corporate entity in making decisions concerning firm business and in making decisions concerning firm business and in performing the myriad small duties demanded of them. The model of the closely held corporation becomes even stronger in a situation where, as in instant case, one person acts as chief executive officer and also holds a majority of the shares in the corporation. In such a situation, the actions of the corporate entity more nearly resemble the conduct of a partnership than of a corporation. Professor F. Hodge O'Neal in his work, Close Corporation Vol. 2, 8.05, has noted this similarity in the management of a closely held corporation and a partnership:
"`Although the same broad principles of corporation CT Page 3625 and agency law determine the powers of officers in both close and publicly held corporations, the factual differences in the patterns of operation of the two kinds of corporations lead to wide disparities in the powers the courts actually recognize in corporate officers.
 In a close corporation, ownership and management normally coalesce; and the participants often conduct their enterprise internally much as if it were a partnership. The courts have seldom articulated a difference in the rules governing officers' powers in close and publicly held corporations; yet they appear in fact to have often cut through the technical legal form of close corporations to reach the results that would be reached if the enterprises were conducted partnerships. In other words, the courts frequently and perhaps usually, recognize in officers of a close corporation the same powers that are possessed by partners in a firm under the general rule of partnership law which makes each partner an agent of the firm for the purposes of its business and empowers each partner to bind the firm by acts apparently carried on to further the usual business of the partnership. '"
In the light of the above, it may to be found that partnership law may indeed be applicable making each of the individual defendants responsible for the other's conduct. See, annotation 70 A.L.R.3d 1298 2.
 VII
Defendants' claims of law
All defendants are represented in this matter by the firms of Katz and Seligman (Attorneys Holtman and Seligman) and Bai, Pollock and Dunnigan (Attorney Turret).
Attorney Seligman filed a post-hearing memorandum in opposition to the plaintiffs application dated January 20, 1991.
Although the Practice Book, Sec. 285A Trial Briefs; Claims of Law, requires that any claim of law must be stated "distinctly," such memorandum does not do so. "Distinct" in Webster's Ninth New Collegiate Dictionary is defined as "separate" or "discrete." Questions of law must be "so stated as to bring to the attention of the court the precise matter upon which a decision is asked." Woodruff v. Butler, 75 Conn. 679,682, "If questions involved in a case are of sufficient importance to justify this court in deciding them, they are worthy of the careful consideration of counsel presenting them." CT Page 3626 State v. Burgess, 5 Conn. Ct. Rep. 617, 619, quoting Hooper v. Fox, 364 Ill. 613, 614. The memorandum cited is devoid of any separation of the issues. It is Proustian rather than Practice Book. To the extent the court can winnow out issues, they will be decided. As to any remaining, it will be presumed the defendants do not wish to pursue them.
1. The practice of the defendants in deducting the additional legal fee was permissible. As noted, supra, the court disagrees with the defendants' interpretation of Sec. 38a-369. The plaintiff's attorney performed no further service to the client by pay off a lien for which he was obligated by law. Shelby Mutual Insurance Co. v. Della Ghelfa, 200 Conn. 630,641.
2. There is a conflict between the fee provisions of 38a-369 and Sec. 52-251c, which puts a cap on contingent fees. Since the latter statute was not in effect at the time of the accrual of the plaintiff's cause of action, there is no issue for the court.
3. The defendants were prosecuting two separate actions — one for the plaintiff, and one for the carrier. The defendants had no attorney-client relationship with the carrier. Koskoff, supra.
4. The amendment to Sec. 52-251c by P.A. 91-380 must be construed as a change in Sec. 38a-369. The defendants cite Waterbury Petroleum Products v. Canaan Oil Co., 193 Conn. 208,232-233, for the proposition that there was a substantive change in the law. The intent of Sec. 38a-369 as amended in 1981 is clear to the court, as it was to the Attorney General, in his advice to the Insurance Commissioner.[3] "An amendment which in effect construes and clarifies a prior statute must be accepted as the legislative declaration of the meaning of the original act." Tax Commissioner v. Estate of Bissell, 173 Conn. 232,246, cited in Shelby Mutual, supra, pp 640-641.
The court has considered the defendants' objections to the validity of the several counts in the complaint, as discussed, supra.
Attorney Turret also filed a supplemental memorandum on January 21, 1991, which appropriately frames and addresses the issues raised.
1. The plaintiff's interpretation of Section 38-325 (b) (now Section 38a-395 (b) violates the contracts clause.Article I, Section 10 of the United States Constitution. CT Page 3627
The defendants state, on page 2, thereof:
"In this case, the defendants made contracts with there clients for the collection of the standard attorney's fee from the entire personal injury award and made separate agreements with insurers for collection of, an attorney's fee from the basic reparations benefits."
The foregoing statement has no support in either law or fact. Sending notice of the lien to the defendants created no attorney-client relationship. Koskoff, supra p. 457; Shelby Mutual, supra p. 641. No evidence was offered by the defendants. Nor do the defendants cite any evidence from which the court could find such a relationship.
2. The plaintiff's interpretation of said statute deprives defendants of property without due process. Suffice to say, again, that there is no factual basis to support this proposition. In the instant case, the defendant, pursuant to the defendants former retainer agreement, contracted for a recovery of one-third of the recovery achieved. That was all they bargained for. The retainer agreement provided that it was subject to any applicable law at the time of recovery.
If the challenge, on either ground, is constitutional basis, then this is the wrong form of action because insurance companies, attorneys and the general public would be affected by this without having notice. Echo Four v. Hill, 3 Conn. App. 118.
 VIII
The court finds that the plaintiff is entitled to a prejudgment remedy by way of attachment of the real property so identified, and garnishments as requested.
All injunctive relief is denied.
The motion for disclosure of assets by the defendants is granted with full compliance within two weeks of the date hereof.
The amount to be secured by such remedies is Three Million Dollars ($3,000,000), as requested, supported by the following calculations:
 Amount in demand (per affidavit — rounded) $680,000
Interest at 10% per annum CT Page 3628 (from 11-30-88 to anticipated date of Judgment 11-30-93) 340,000 ---------- 1,020,000
 Treble damages per statute(52-564) 3,060,000 Attorney's Fees (CUTPA) 200,000 ---------- $3,260,000
BURNS, J.